Davy **VAN DE SANDE**, Petitioner–Appellee,

v.

Jennifer **VAN DE SANDE**, Respondent–Appellant.

No. 05–2831.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 2005.

Decided Dec. 7, 2005.

Bruce A. Boyer (argued), Loyola University School of Law, Chicago, IL, for Petitioner–Appellee.

Lawrence A. Rosen (argued), Chicago, IL, for Respondent–Appellant.

Before BAUER, POSNER, and WOOD, Circuit Judges.

POSNER, Circuit Judge.

The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.*, implementing the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), entitles a person whose child has been abducted to the United States (usually by a parent) to petition in federal court for the return of the child. 42 U.S.C. § 11603(b). "The Convention was created to discourage abductions by parents who either lost, or would lose, a custody contest.... The Convention draft-

ers adopted a 'remedy of return' ... to discourage abductions, reconnect children with their primary caretakers, and locate each custody contest in the forum where most of the relevant evidence existed. [But] while the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence." Merle H. Weiner, "Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction," 33 *Colum. Human Rts. L.Rev.* 275, 278–79 (2002). In such a case "the remedy [of return] puts the victim's most precious possession, her child, in close proximity to her batterer either without her protection (assuming she does not return with the child), or with her protection, thereby exposing her to further violence." Merle H. Weiner, "International Child Abduction and the Escape from Domestic Violence," 69 *Fordham L.Rev.* 593, 634 (2000); cf. 18 U.S.C. § 1204(c)(2). "A typical pattern involves a female U.S. national who has married a male foreign national and moved with her spouse to a foreign country. In most Hague cases invoking grave risk on the basis of domestic violence, the abuse begins before the transnational move. Ultimately, the victim flees with her children back to the United States in order to escape the abuse. The batterer, left behind in the country of habitual residence, then files a petition under the Hague Convention requesting return of the children to adjudicate the custody issues." Roxanne Hoegger, "What If She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy," 18 *Berkeley Women's L.J.* 181, 187 (2003).

The present case approximates the "typical pattern" in which the remedy of return

is problematic. The two children of Davy and Jennifer Van De Sande, a married but estr'anged couple, are habitual residents of Belgium, Davy's native country. Davy has been awarded custody of his two children by a Belgian court, but Jennifer, who is living with the children in the United States, has refused to give them up. She became an "abducter" when Davy got the custody decree, though it was ex parte. Davy brought this suit to get the children back.

An abducter has a narrow defense: Article 13(b) of the Convention excuses return if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The abducter must prove this by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). Although Jennifer submitted affidavits setting forth the circumstances that she contends create such a risk, the district court granted summary judgment for Davy, primarily on the ground that there is no indication that the Belgian legal system cannot or will not protect the children. The only condition that the judge inserted in the order directing the return of the children to Davy is that he pay for their airfare to Belgium.

Jennifer presented six affidavits—two by her and one each by her father, her mother, her brother, and a friend. The affidavits paint a consistent and disturbing picture. According to them Davy began beating Jennifer shortly after their marriage in 1999. The beatings were frequent and serious. For example, when she was seven months pregnant with their first child, Davy slammed Jennifer's head against a wall, choked her, and pushed her toward the top of a flight of stairs, threatening to topple her down them. The beatings, which typically consisted of choking Jennifer, throwing her against a wall, and

kicking her in the shins, and occurred several times a week throughout the marriage whenever the two of them were together, continued when they moved from the United States to Belgium. Davy's mother joined in beating her daughter-in-law. (The Van De Sandes' grievance against Jennifer is that she is an indifferent housekeeper.) She complained several times to the Belgian police, but they said they could do nothing unless she went to a doctor to verify her injuries; and she did not do that.

Davy's beatings of Jennifer continued after the two children were born, and were often done in their presence, which caused them to cry. The older child (born in August 2000, so 4 years old when her mother refused to return to Belgium in October 2004) would tell her father to stop, but without success. Physical abuse of the daughter by her father began when she started wetting her bed. He would spank her, and once when Jennifer entered the girl's bedroom and told Davy to stop beating their daughter he grabbed Jennifer by the throat and shoved her out of the room. Once he struck the daughter a sharp blow to the side of her head. His mother (the daughter's grandmother) struck the daughter in the head at least twice.

Davy also abused Jennifer verbally in the children's presence, calling her a "cunt," "whore," "lazy fucking bitch," and "lazy fat bitch." (He is fluent in English, as are the children.) Davy once told their daughter "Fuck mommy." And one time he picked her up, sat her on his lap, and said, "Tell Mommy she's a cunt."

In 2004, during a visit to Jennifer's parents, Jennifer told Davy that she and the children would not return to Belgium. He threatened to kill the children. He had earlier threatened to kill Jennifer. And the next day, in a conversation with Jennifer's brother, he threatened to kill "every-

body." Jennifer told her father about Davy's threats, and the police were called and an officer escorted him from the house.

After he returned to Belgium without the children, the daughter stopped wetting her bed—except after her weekly phone conversation with him. It was after returning to Belgium that he obtained ex parte the order from the Belgian court awarding him custody of the children and thus providing him with the precondition to bringing this suit.

■ If the affidavits submitted by Jennifer are accurate, as we must assume they are, given the procedural posture of the case, Jennifer has satisfied the statutory requirement that her evidence of risk of harm to the children be clear and convincing. Cf. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 508, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). But is it clear and convincing evidence of a *grave* risk of harm? The district judge thought not. In reaching this conclusion, however, he was unduly influenced by the fact that most of the physical and all the verbal abuse was directed to Jennifer rather than to the children. The younger child, a boy, apparently wasn't beaten at all; the girl was spanked and hit repeatedly, but not injured; and no expert evidence of the psychological effect of Davy's conduct on either child was presented.

■ The judge inexplicably gave no weight to Davy's threat to kill the children. Perhaps, standing alone, such a threat could be discounted as an emotional reaction to the prospect of losing custody of them. But given Davy's propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epi-

thets at her also in their presence, it would be irresponsible to think the risk to the children less than grave. The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes. *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 377 (8th Cir.1995); cf. *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) (L.Hand, J.). The probability that Davy, or his mother, another person of violent temper (if the affidavits are true), would some day lose control and inflict actual physical injury on the children (or at least on the daughter) could not be thought negligible.

But against this it can be argued that the Hague Convention is really just a venue statute, designed "to deter parents from engaging in international forum shopping in custody cases." *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir.2005); see, e.g., *Silverman v. Silverman*, 338 F.3d 886, 899 (8th Cir.2003). Maybe we should be asking not what the risk to the children might be in a jurisdiction that had no laws for the protection of children, but merely whether the jurisdiction of residence has adequate laws; Belgium, we can assume, does.

*Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir.1996), proposed such an approach, but did so in acknowledged dictum, *id.* at 1069, since "Mrs. Friedrich alleges nothing more than adjustment problems that would attend the relocation of most children," and thus her defense of grave risk of harm failed at the threshold. *Id.* at 1067. The dictum has been repeated, e.g., *March v. Levine*, 249 F.3d 462, 471 (6th Cir.2001); *Miller v. Miller*, 240 F.3d 392, 402 (4th Cir.2001); *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir.2001), and it influenced the district court in this case, but we do not think it correct. See *Nunez–Escudero v. Tice–Menley, supra*, 58 F.3d at 377. There is a difference between the

law on the books and the law as it is actually applied, and nowhere is the difference as great as in domestic relations. Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected. *Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Coy v. Iowa,* 487 U.S. 1012, 1022, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (concurring opinion). To give a father custody of children who are at great risk of harm from him, on the ground that they will be protected by the police of the father's country, would be to act on an unrealistic premise. The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody.

■ Moreover, to define the issue not as whether there is a grave risk of harm, but as whether the lawful custodian's country has good laws or even as whether it both has and zealously enforces such laws, disregards the language of the Convention and its implementing statute; for they say nothing about the laws in the petitioning parent's country. The omission to mention them does not seem to have been an accident—the kind of slip in draftsmanship that courts sometimes correct in the exercise of their interpretive authority. If handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over, however severely the law of the parent's country might punish such behavior. In such a case, any order divesting the abducting parent of custody would have to be conditioned on the child's being kept out of the custody of the abusing parent until the merits of the custody dispute between the parents could be resolved by the court in the abusive parent's country.

At argument Davy's lawyer was willing to entertain the possibility that the district judge should have imposed such a condition on the order returning the children to Davy in Belgium. This concession alone requires that we remand the case to the district court for further consideration, for "in order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent." *Feder v. Evans–Feder,* 63 F.3d 217, 226 (3d Cir.1995); see also *Gaudin v. Remis,* 415 F.3d 1028, 1035–36 (9th Cir.2005); *Blondin v. Dubois,* 189 F.3d 240, 248–49 (2d Cir.1999).

But "undertakings," as an alternative to refusing to return the child, will not always do the trick. *Walsh v. Walsh,* 221 F.3d 204, 219 (1st Cir.2000). The ex parte order that Davy obtained, granting him custody of the children, does not preclude Jennifer's challenging his custody; and we are told that in April of this year Jennifer filed such a challenge in a Belgian court but that the court has taken no action. Pending resolution of the custody dispute, prudence would require that the children if returned to Belgium be placed in the custody of some third party in that country—obviously not Davy's mother! (assuming as we must at this stage of the litigation that she really did beat her granddaughter). Instead of remaining in their own mother's custody in the United States, the children might find themselves in a foster-care institution until the custody litigation was resolved, even though there is no suggestion that their mother is an abusive, neglectful, or otherwise unfit parent, whatever the deficiencies in her housekeeping skills.

■ Return plus conditions ("undertakings") can in some, maybe many, cases properly accommodate the interest in the child's welfare to the interests of the coun-

try of the child's habitual residence. Often the bulk of the evidence concerning risk of harm will be found in that country and the left-behind parent's defense to charges of abuse may be more difficult and costly to prepare and present in the country to which the abducter has fled. But in cases of child abuse the balance may shift against return plus conditions. In a comment on "undertakings" that was quoted with approval in *Danaipour v. McLarey*, 286 F.3d 1, 25 (1st Cir.2002), the State Department has advised that "if the requested ... court is presented with unequivocal evidence that return would cause the child a 'grave risk' of physical or psychological harm, ... then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context could embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(b) exception." The court added that "undertakings are most effective when the goal is to preserve the status quo of the parties prior to the wrongful removal. This, of course, is not the goal in cases where there is evidence that the status quo was abusive." 286 F.3d at 25; see also Hoegger, *supra*, 18 *Berkeley Women's L.J.* at 196–99; Weiner, *supra*, 69 *Fordham L.Rev.* at 678–81.

■ Concern with comity among nations argues for a narrow interpretation of the "grave risk of harm" defense; but the safety of children is paramount. Jennifer presented at the summary judgment stage sufficient evidence of a grave risk of harm to her children, and the adequacy of conditions that would protect the children if they were returned to their father's country is sufficiently in doubt, to necessitate an evidentiary hearing in order to explore these issues fully. The hearing should be held promptly and conducted expeditiously in order to comply with the Convention's goal of expediting the return of abducted children to their country of habitual residence, Hague Convention, *supra*, Art. 11; *March v. Levine, supra*, 249 F.3d at 474, provided that the return will not expose the children to a grave risk of harm.

REVERSED AND REMANDED.